[Cite as *In re L.C.*, 2019-Ohio-3878.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| L.C. | : | Hon. Patricia A. Delaney, J. |
| J.T. | : | Hon. Craig R. Baldwin, J. |
| L.Y. | : | |
| F.Y. | : | |
| E.Y. | : | Case Nos. 2019CA00070 |
| | : | 2019CA00071 |
| | : | 2019CA00072 |
| MINOR CHILDREN | : | 2019CA00073 |
| | : | 2019CA00074 |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Stark County Court of Common Pleas, Family Court Division, Case Nos. 2017 JCV 909, 2017 JCV 910, 2017 JCV 911, 2017 JCV 912, 2017 JCV 913

JUDGMENT: Affirmed

DATE OF JUDGMENT: September 23, 2019

APPEARANCES:

For Plaintiff-Appellee

BRANDON J. WALTENBAUGH
Stark County JFS
402 2nd Street SE
Canton, Ohio 44702

For Defendant-Appellant

AARON J. VIOLAND
Stark County Public Defender Office
201 Cleveland Ave S.W.
Suite 104
Canton, Ohio 44702

*Baldwin, J.*

{¶1}    Appellant T.C. appeals from the April 29, 2019 Judgment Entries of the Stark County Court of Common Pleas, Family Court Division, terminating her parental rights and granting permanent custody of her five children to Stark County Department of Job and Family Services.

STATEMENT OF THE FACTS AND CASE

{¶2}    Appellant T.C. is the biological mother of L.C. (DOB 5/3/2009), J.T. (DOB 11/13/2010), L.Y. (DOB 2/13/2012), F.Y. (DOB 6/12/2014), and E.Y. (DOB 1/22/2016). On August 3, 2017, Stark County Department of Job and Family Services (SCDJFS) filed complaints alleging that the children were dependent and/or neglected. Following an emergency shelter care hearing on August 4, 2017, the trial court placed the children into the emergency temporary custody of SCDJFS.

{¶3}    An adjudication hearing was held on October 19, 2017. The Magistrate, in Decisions filed on October 20, 2017, found the children to be neglected after appellant stipulated to the same. As memorialized in separate Decisions filed on the same day, the children were placed in the temporary custody of SCDJFS. On July 27, 2018, temporary custody with the agency was extended to February 3, 2019.

{¶4}    Subsequently, on November 29, 2018, SCDJFS filed motions seeking permanent custody of the children. In its motion, the agency alleged, among other things, that the children could not be placed with appellant within a reasonable period of time, that the children had been in the temporary custody of SCDJFS for 12 or more months in a consecutive 22 month period, and that permanent custody was in the children's best interest.

{¶5}    A permanent custody hearing was held on April 25, 2019. At the hearing, Amy Craig, an employee with SCDJFS, testified that the agency had been involved with the family since 2011 over concerns about home conditions, lack of utilities, lack of supervision of the children, mental health issues with appellant and/or the children and a decline of the mental or physical health of the children. She testified that the children were placed in foster care and that she had been the ongoing caseworker since the case was filed in August of 2017.  She testified that the children had been continuously in the agency's custody since October 19, 2017 and that this was in excess of twelve of the past twenty-two months. According to Craig, none of the fathers had been involved with the case or services, although services were offered to the fathers.

{¶6}    Craig testified as follows when asked about appellant's case plan:

{¶7}    "Sure, she [appellant] was asked to complete a CommQuest assessment which she did but there was no concern there, drugs have not been a concern with mom. She was also asked to complete a Northeast Ohio parenting assessment, which she did and then to follow any recommendations that they offered for her.  The recommendations included mental health treatment, Goodwill parenting classes, upon a successful completion then home based parenting.  Housing and employment.  If the children were to be returned, protective day care, as well as any home based case management services for the family.  So based off of those recommendations, she did in fact go to Goodwill.  Unfortunately she went twice and failed both times.  Um she was also with the housing and employment piece, she has had housing the whole time I have known her.  Um employment has been hit or miss, she will have a job and then she doesn't have a job.  With regard to mental health treatment, she does attend mental health treatment and

has a case manager and appears to have made some progress in that service. So those are kind of the case plan services in a nutshell."

{¶8} Transcript at 9. Appellant, according to Craig, completed the parenting evaluation and appellant's home was not a safety risk to the children. While appellant had not had working utilities or had limited utilities for about a year, Craig testified that appellant had since had them turned on after receiving help from outside sources.

{¶9} Craig testified that she spoke with the Guardian ad Litem (GAL) and that the GAL believed that appellant was not working. Appellant had at least three places of employment during the lifetime of the case and one of them involved working with her mother under the table. Craig testified that appellant had not been able to maintain employment for long periods of time and that most of appellant's jobs lasted for a period of weeks. Appellant relied on others, including her mother and boyfriends, to help support her and her life.

{¶10} When asked, Craig testified that the children's maternal grandmother was a source of concern and was part of the reason for the pickup of the children because she was not an appropriate person to supervise and had a history with the agency. Appellant, in her parenting evaluation, had indicated that her upbringing with her mother involved issues with neglect and drug use. Craig testified that appellant had been told that her mother was not appropriate and that she continued using her mother as a source of support. She also testified that appellant "kind of goes from guy to another guy and that is a concern" and that appellant had had four gentlemen callers in 18 months and had been engaged at least twice during such time. Transcript at 14. Appellant was currently living with a man and was engaged to him. They were living in appellant's home.

{¶11} Craig testified that each of the five children had significant needs beyond the norm and had diagnosed conditions that would make parenting more difficult. The following is an excerpt from Craig's testimony:

{¶12} Q: And with mother's completion of the parenting eval, with mother's maintenance of the home, with mother's attempt to complete Goodwill parenting twice, is there a discernable difference in the mother's safety and ability to parent these children from the beginning of the case until now?

{¶13} A: No, unfortunately like I stated before, she failed goodwill twice after given two opportunities to do this. The visitation from the beginning to now, there has been marginal to no improvement on the visitation, they remain chaotic and unorganized. They are just chaotic and require multiple redirection from workers or the guardian.

{¶14} Q: So it takes many people?

{¶15} A: Yes.

{¶16} Q: How long are the visits mother enjoys with the children?

{¶17} A: Up until recently they were two hours every other week, with the exception of being in Goodwill they were weekly. We have since the plan was no longer reconfirmed, they have been moved to every other week for an hour.

{¶18} Q: In your mind with mother's failure to successfully complete Goodwill Parenting two times, has anyone successfully completed a case plan services in this case?

{¶19} A: No.

{¶20} Q: And do you believe that you and the Agency have made reasonable efforts to assist this family with reunifications goals?

**{¶21}** A: Yes.

**{¶22}** Q: And do you believe that compelling reasons exist today to ask for this permanent custody?

**{¶23}** A: I do yes.

**{¶24}** Transcript at 17-18.

**{¶25}** On cross-examination, Craig admitted that appellant had lived in the same house throughout the pendency of the case and that appellant had told her that she had the utilities turned on. Craig testified that appellant was participating in mental health treatment through Phoenix Rising and had been involved with Phoenix Rising since shortly after the case was opened. She testified that the man appellant lived with did not have a criminal history.

**{¶26}** According to Craig, L.C., the oldest child, had been diagnosed with ODD and conduct disorder and the youngest child had a very rare genetic condition that only four people in the world have. Appellant had failed Goodwill Parenting twice. The first time appellant was terminated because she violated the behavior contract and had many absences and was tardy. The first time, appellant did not score well on the post-test, having scored 69%. The second time, appellant received a certificate of non-compliance which meant that she had not met all of the set forth goals within that class. Only one of the twelve goals was accepted and appellant's post-test score was 83%. Craig testified that the visits at Goodwill were chaotic and unorganized and that there were concerns about supervision issues and inappropriate conversations, so Goodwill staff members had to monitor the visits. Appellant lost track of the children during visitation and did not follow through with recommended suggestions relating to visitation. On redirect, Craig

testified that appellant was incapable of safely watching her children for one or two hour periods of time despite eighteen months of agency assistance and two rounds of Goodwill. She testified that during appellant's first round with Goodwill, five behavior contracts had to be put in place which was a large number for one person. The second time with Goodwill, appellant completed the class, but was not successfully discharged. According to Craig, appellant's parenting had not improved even under supervision.

{¶27} The next witness to testify was Amy Marie Thomas, who was with Lifehouse Family Center. Thomas had been employed with Northeast Behavioral Health as a psychologist and licensed clinical counselor and appellant had been referred to her for a parenting evaluation. Appellant completed the parenting evaluation and Thomas completed a report dated January of 2018. According to Thomas, appellant has a full scale IQ of 79, which is below average. Thomas testified that appellant talked about her mother and that Thomas was able to glean that appellant was exposed to domestic violence and very poor parental role models and that appellant's mother did not provide any structure for her. Appellant acknowledged that her mother had a substance abuse history that involved the use of alcohol and crack cocaine.

{¶28} Thomas testified that appellant pursued a relationship with a man who had an extensive criminal history and just been recently released from prison. Appellant reported that this man had assaulted her, but she still remained romantically involved with him. She felt that he was not responsible for the assault because he was under the influence of alcohol. In addition, she indicated that appellant went from one relationship to another. Thomas testified that at least four individuals were the fathers of the children

and that appellant was not forthcoming with all of the names of the individuals who may or may not be the biological fathers of her children.

**{¶29}** Thomas testified that Phoenix Rising had diagnosed appellant with bipolar 2 disorder, but that appellant was troubled with being prescribed medications for the rest of her life. She stated that in her opinion, appellant had never really fully operated as an independent individual. Based on appellant's description of her home situation, appellant had lost control of her children. Thomas testified that she was concerned about appellant's ability to reunify with her children based on her involvement with the agency since 2011 and the fact that despite having multiple services provided to her, appellant had difficulty providing the children with the structure and supervision that they required. When asked what recommendations she made for appellant, Thomas testified as follows:

**{¶30}** "I recommended that she participate in comprehensive mental health treatment services. Her description of her mental health as I stated earlier, indicated that she does meet the criteria for bipolar disorder. She experienced periods of depression, low energy and when you are responsible for raising children, you really need to be on top of the game. Especially with children who have special needs. When parents are depressed they may be rather lax or laying around and not have the energy to be consistent. In terms of, she denied anger management issues during the course of the interview, but collateral data suggested that was source of concern as well as some suicidal gestures. So certainly the need to participate in counseling and psychiatric services toward stabilizing her mood would have improved her ability to complete other aspects of the case plan and competently raise the children. I recommended that after she was stabilized on medication um as when people are not yet stabilized can impact

their learning ability, I recommended that she participate in Goodwill parenting classes. I recommended that the home based Goodwill program become involved with her upon a reunification of (sic) that should that occur to provide additional support and props to her given the number of children and their special needs. I recommended that she participate in joint counseling with her children at the discretion of the children's therapist and that would allow her to develop some additional parent consultation with the therapist. I recommended that she secure and maintain gainful employment. I recommended that the children are enrolled in a protective day care setting upon reunification. Just that environment would provide more structure and oversight for the children as admitted [appellant] clearly appeared overwhelmed with raising the children. I also recommended that in home services remain involved with the family on going due to the children's special needs."

**{¶31}** Transcript at 37-38.

**{¶32}** Thomas agreed that appellant's failure to complete the Goodwill parenting class negatively impacted her ability to take care of her children.

**{¶33}** On cross-examination, Thomas testified that appellant's medication compliance was a source of concern and that she had not had any interaction with appellant since November 8, 2017.

**{¶34}** April Bergert, a parenting instructor with Goodwill Industries, testified that appellant was a participant in their program and that she was appellant's parenting instructor for both sessions that appellant attended. Appellant first began her involvement with Goodwill January 8, 2018 and was terminated on March 15, 2018. Appellant was required to sign five behavior contracts in her first attempt at the Goodwill classes, which

was a large number. The contracts were made necessary by concerns over appellant's inability to supervise or care for all of her children at once and appellant's absences. Appellant had more absences after signing the contract and had eight absences in total while the participants were not allowed to exceed seven absences. Bergert testified that because of appellant's cognitive delays, this was a concern. Appellant also was required to sign a behavior contract to remain alert and awake during class for instruction and struggled with this contract. The last behavior contract was signed after Goodwill received results from CommQuest related to a diluted screen that was collected on February 12, 2018. This screen was considered a positive screen. The agency had no issues with his contract.

**{¶35}** Bergert testified that appellant's visits with her children were chaotic and that appellant "struggled to supervise her children at one time." Transcript at 47. She testified that appellant did not demonstrate the skills that she should have learned from the classes and that discipline was not appropriate during the visits and that conversation was not appropriate. Appellant, during the visits, had conversations about wanting to introduce her new partner to her children and about what color they wanted to paint their rooms when they got home. Bergert was concerned that the conversations could have a negative effect on the children. Appellant's relationship with L.C. was not that of a mother and daughter, but rather "two people that were relying on each other emotionally" and L.C., who was eight years old, was "parent-fied." Transcript at 50. L.C. was interested in preforming all of the duties that appellant was required to do, like feeding the children. After appellant was terminated from the Goodwill program, it was recommended that she show significant progress in individual counseling before re-enrolling to address concerns

about appellant's coping skills and her lack of wanting to talk about her past. Due to appellant's absences, this goal was not completed. While appellant re-enrolled in the Goodwill program, she did not successfully complete the program. During her second attempt at Goodwill parenting classes, appellant had one behavior contract to address managing the children during visitation. Appellant had to be reminded weekly of what to do and staff ended up helping corral the children to make sure that they were safe. Bergert testified that appellant's conversation with her children was not appropriate and that "positive engagement with her children was lacking." Transcript at 56. During the period from January of 2018 through August 31, 2018, Bergert did not see my improvement in appellant's ability to manage the children during visits. And testified that in her mind, appellant was not able to successfully navigate all of her children with their different ages and needs.

**{¶36}** Bergert also testified that she had concerns with appellant's financial stability and her ability to keep the utilities running in the home. During appellant's second involvement with Goodwill, her electricity and water were off for ten weeks. A previous partner had racked up bills in appellant's name and never paid them, causing appellant to have an over $2,000.00 electric bill. While appellant wanted to have a male friend pay the bill, she later changed her mind and admitted that it was not a good idea. Appellant was dependent on other people and struggled to establish boundaries. Appellant also considered receiving financial assistance from her mother. Bergert noted that appellant's mother was not a positive support for her and discussed with appellant that it was not in appellant's best interest to depend on her mother. Appellant was too reliant on others and not on herself.

**{¶37}** During appellant's second involvement with Goodwill, she completed one out of twelve of her program goals, or 8%, after better attendance and accommodation by the staff to try to assist her because of her cognitive delays. Appellant did not even complete a below average amount of the course requirements. Bergert testified that the agency did not recommend that appellant attempt the program a third time and that they were "not considering any recommendations to continue the reunification process." Transcript at 61.

**{¶38}** On cross-examination, Bergert testified that she encouraged appellant to come to the visits early to prepare for them and that while appellant arrived on time, her ability to prepare and get situated before the children came was inconsistent. Appellant did not apply skills she learned during her visits. Bergert testified that appellant was encouraged to ask for assistance in completing her goals.

**{¶39}** Jennifer Fire, a parenting supervisor with Goodwill Industries, testified that she supervised Bergert and was involved with appellant's instruction at Goodwill. She observed visits or information given to appellant during both of appellant's Goodwill sessions. During appellant's first involvement, her visits with her children were "very hectic, chaotic, requiring attention from all staff….Required constant direction with supervision, discipline, …" Transcript at 75. Fire testified that the visits during the end of August of 2018 continued looking pretty identical, but that appellant then had an attitude change and came in much more positive towards staff and able to accept direction and suggestions and recommendations better, although appellant's "follow through was very much lacking still." Transcript at 75. She agreed that while appellant was better taking in information, applying the information to her actual interaction with her children was a

problem, creating a safety risk to the children in Fire's mind. The children needed multiple people to corral them at all times. Fire did not think that appellant's parenting abilities could be improved with a third attempt at the Goodwill program or any other program.

**{¶40}** On cross-examination, Fire testified that one of her biggest concerns was appellant's ability to either discipline or supervise her children safely. She was also concerned over appellant's financial instability, her lack of utilities, her unstable relationships and how appellant was very dependent on her mother. Because of the children's special needs, Fire testified that appellant needed to implement specific discipline techniques for each of them.

**{¶41}** Katie Gula, appellant's mental health case manager through Phoenix Rising, testified that she had been working with appellant since between June and July of 2018. She testified that appellant had gotten her home back in order and the utilities turned on, and that they had worked on getting appellant proper medication to get her moods stabilized. Gula testified that appellant had reached her goals as far as mental health symptoms and learning how to cope with them independently. She testified that, the last year, appellant had been consistent with working with a counselor.

**{¶42}** Gula testified that she had attended some of the family visits and that appellant tried to be attentive to each child's needs. She testified that "[s]ome of her symptoms are of anxiousness. So when I am looking at the class, I am looking at more her symptoms and she appears more anxious to me. I don't know for me if I would say chaotic or that she is more on her toes to be implementing the things that they are teaching her." Transcript at 83-84. Gula testified that appellant needed more communication and that she had to have matters reframed or clarified. Gula, on cross-

examination, testified that as part of her job, she was an advocate for appellant and that as appellant's advocate, she felt that appellant was doing the best that she could and had shown a lot of strength and change in the past year.

{¶43} At the hearing, appellant testified that she was currently employed at Case Farms full time, that she had lived in the same place for five years, and that her utilities were current or active. Appellant testified that at the time she started Goodwill, she was not aware of all of the children's special needs and only knew that her son had a processing disorder. According to appellant, she turned in her program goals for Goodwill parenting early and was advised that they were incomplete. Appellant testified that other than very brief feedback, she was not given any guidance on how to correct the goals. On cross-examination, appellant testified that she did not need help parenting her children and that she thought that the Goodwill staff was exaggerating her ability to care for her children a little bit. She also testified that she needed more information about her children's special needs.

{¶44} During the best interest portion of the hearing, Amy Craig testified that she was the ongoing caseworker assigned to the children in this case and had been involved with the family since August 15, 2017. She testified that all of the children are Caucasian. Craig testified that L.C. has a history of having melt downs at school and has poor coping skills. The police were called because of some of L.C.'s behavior. L.C. was hospitalized at Belmont Pines for about a week and was physically and verbally abusive to her siblings. After a second trip to the hospital, L.C. was moved to a new foster home after trying to hurt her little sister physically. L.C. gets in a kind of "rage state" and attends counseling. Transcript at 99. L.C. struggles in school and is on medication for an adjustment disorder.

Craig testified that J.T. has trouble processing language and has an IEP. He receives speech and occupational therapy as well as assistance with reading and math. He also is in counseling and on medication.   L.Y. is in counseling and on medication and had been diagnosed with ODD and has conduct disorder. L.Y., Craig testified, was the most challenging of the children and had many behavioral outbursts, steals from school and home and has a history of lying.  She also has thrown chairs at teachers and tried to hurt her foster parents. Craig testified that L.Y. had been in a new foster home for less than a week and had been doing okay. L.Y. also was on an IEP, received speech, physical and occupational therapy.

**{¶45}** Craig also testified that E.Y. has a rare genetic condition called 6Q26 chromosome duplication and will require ongoing monitoring of her pituitary gland and hormones. She will require hormonal therapy. E.Y.'s speech was delayed and as a result of her chromosome issue, there will be cognitive delays.

**{¶46}** Craig testified that each of the children was in a separate foster home due to their behavior and special needs.  She testified that the agency's custody of the children had positively affected them because they had been in consistent counseling and routines. Only one of the children was placed in a home willing to adopt. Craig testified that she was unaware of any appropriate relatives to care for the children. She testified that although the children were bonded with appellant, the benefit of permanent custody would outweigh the harm that the children would suffer by severing that bond. She testified that they would be provided with stability and that permanent custody of the five children was in their best interests.

**{¶47}** The Guard ad Litem for the children testified as follows at the hearing:

{¶48} "MS. SHEETS: I agree with what the County has decided. I believe these five children will benefit from new homes. I know their mother has tried very hard. I have seen a great improvement in her, in taking care of herself. I am very proud of her for that and I hope she will continue to do that. I don't think she has the skills and the self-confidence and just the life lessons to raise these five children. I hate to say that but I do believe that. She has had a very difficult upbringing herself. She has had no good example of parenting and so she just did what she thought was best. Unfortunately it is not enough to meet the needs of these children. And that is who my concern is with. I hope today that we do get custody of them and we can go on to see them grow up in good homes."

{¶49} Transcript at 110.

{¶50} At the hearing, L.Y.'s foster mother testified that L.Y. was thriving and very happy.

{¶51} Pursuant to Judgment Entries filed on April 29, 2019, the trial court terminated appellant's parental rights and granted permanent custody of the children to SCDJFS. The trial court filed Findings of Fact and Conclusions of Law on the same date.

{¶52} Appellant now appeals, raising the following assignments of error on appeal:

{¶53} "I. THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILDREN CANNOT AND SHOULD NOT BE PLACED WITH APPELLANT WITHIN A REASONABLE PERIOD OF TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**{¶54}** "II. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE CHILDREN WOULD BE SERVED BY GRANTING PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

I

**{¶55}** Appellant, in her first assignment of error, argues that the trial court's finding that the children could not or should not be placed with her within a reasonable period of time was against the manifest weight of the evidence.

**{¶56}** A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]hat measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt as in criminal cases." *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954); *In re: Adoption of Holcomb,* 18 Ohio St.3d 361, 481 N.E.2d 613 (1985).

**{¶57}** In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60 (1990); *See also, C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements

of the case," a reviewing court may not reverse that judgment. *Schiebel,* 55 Ohio St.3d at 74.

**{¶58}** Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Id.* Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

**{¶59}** Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 1997–Ohio–260, 674 N.E.2d 1159.

**{¶60}** Pursuant to R.C. 2151.414(B), the court may grant permanent custody of a child to the movant if the court determines "that it is in the best interest of the child to grant permanent custody to the agency that filed the motion for permanent custody and that any of the following apply:

**{¶61}** (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child

placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶62}** (b)  The child is abandoned....

**{¶63}** (c)  The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

**{¶64}** (d)  The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶65}** The trial court, in the case sub judice, made findings pursuant to R.C. 2151.414(B)(1)(a) and (B)(1)(d).  Appellant does not challenge the trial court's finding that there was clear and convincing evidence that the children had been in the temporary custody of a public children services agency for twelve or more months of a consecutive twenty-two month period pursuant to R.C. 2151.414(B)(1)(d). As findings under R.C. 2151.414(B)(1)(b)  and  R.C.  2151.414(B)(1)(d)  are  alternative  findings,  each  is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni*, 5th Dist. Tuscarawas No. 2007 AP 0041, 2007–Ohio–5805. This finding alone,

in conjunction with a best interest finding, is sufficient to support the grant of permanent custody *In re Calhoun*, 5th Dist. Stark No. 2008CA00118, 2008–Ohio–5458, ¶ 45.

**{¶66}** However, even if we consider appellant's first assignment of error, we find that the trial court did not err in determining the children cannot be placed with appellant at this time or within a reasonable period pursuant to R.C. 2151.414(1)(a).

**{¶67}** R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

**{¶68}** (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

**{¶69}** (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether

the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties....

**{¶70}** As is discussed above, there was testimony that appellant had failed Goodwill parenting classes twice and that visitation between appellant and her children was chaotic and disorganized. There was testimony that appellant could not safely watch her children for even minimal periods of time and that appellant lacked financial stability. At times, appellant's utilities were not working and appellant associated with inappropriate people.  In addition, appellant's employment was sporadic.

**{¶71}**  Appellant's first assignment of error is, therefore, overruled.

**{¶72}**  Appellant also contends that the trial court's finding that it was in the best interest of the children for permanent custody to be granted to the agency was against the manifest weight and sufficiency of the evidence. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶73} At the best interest hearing, there was testimony that the children all had significant behavioral special needs and that one has a rare genetic condition that would require continual monitoring throughout her life.    Amy Craig testified that the agency's custody of the children had positively impacted them because they had been in counseling and had consistency within their lives. Only one of the children was in a home willing to adopt and there were no suitable relatives for placement. Craig also testified that children were bonded with appellant and loved her, but that the benefit of permanent custody would outweigh by any harm caused by termination of the relationship. She indicated that the children needed stability within their homes. The Guardian ad Litem, both at the hearing and in her report, agreed that permanent custody was in their best interest due to appellant's lack of parenting skills and inability to meet their needs. There also was testimony that L.Y. was in a foster home and was thriving.

**{¶74}** Based on the foregoing, appellant's second assignment of error is overruled.

**{¶75}** Accordingly, the judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Delaney, J. concur.